### JOHN BONURA & CO., INC., v. TEXAS & N. O. R. R. CO.

---

(March 10, 1930. Opinion and Decree.)
(May 5, 1930. Rehearing Refused.)
(July 3, 1930. Writ of Certiorari and Review Denied by Supreme Court.)
(October 20, 1930. Writ of Certiorari and Review Denied by U. S. Supreme Court.)

---

Chas. F. Fletchinger, of New Orleans, attorney for plaintiff, appellee.

Denegre, Leovy & Chaffe, and N. P. Phillips, of New Orleans, attorneys for defendant, appellant.

HIGGINS, J. Plaintiff sues defendant for the sum of $406.75 damages alleged to have been sustained on a shipment of a car containing 320 crates of "Iceberg Lettuce," consigned to plaintiff at New Orleans by Louis Garat from Colma, Cal., on July 27, 1927; the car arriving at its destination over the lines of defendant as delivering carrier on August 5, 1927.

The petition charges that the loss and damages sustained to the lettuce resulted

from the improper handling of the goods in transit; the failure of the carrier to transport the perishable goods in a car properly cooled and conditioned with equipment especially adapted to that purpose; to steadily maintain the requisite refrigeration from point of origin to time of delivery to petitioner.

The defendant admits the issuance of the bill of lading, but denies all other allegations in the petition, and especially pleads that "if the condition of the said shipment when delivered at destination was not good (which is denied for want of information) that this was due to a defect or vice in the property or to causes for which the carrier had no control and for which they were not responsible." In this connection respondent specially pleaded section 1 of the bill of lading under which the shipment moved.

There was judgment in favor of plaintiff for the full amount of the claim, and defendant has appealed.

The pertinent parts of the bill of lading read as follows:

"Dry car—Vents closed plugs in to first icing station. Ice to full capacity at first icing station, adding two per cent salt of tank capacity. Keep fully iced to destination, adding two per cent salt of amount ice furnished with each re-icing. 7500 pounds top ice."
"Section 1. (b) No carrier or party in possession of all or any of the property herein described, shall be liable for any loss thereof or damage thereto, or delay caused by the act of God, the public enemy, the authority of law, or the act of default of the shipper or owner, or for natural shrinkage * * * except in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession) the carrier or party in possession shall not be liable for loss, damage or delay occurring while the property is stopped and held in tran-sit under the request of the shipper, owner, or party entitled to make such request, or resulting from a defect or vice in the property, or for country damage to cotton or from riots or strikes."

The record shows that Louis Garat, the shipper, had fourteen years' experience as a shipper and distributor of fruits and vegetables in California. That the plaintiff has been in the business of buying and selling fruits and vegetables in the city of New Orleans for a number or years. Plaintiff ordered a carload containing 320 crates of "Iceberg Lettuce" from Louis Garat. At the request of the shipper the lettuce was inspected by a representative of the United States Department of Agriculture (Bureau of Agricultural Economics), whose certificate of inspection was introduced in evidence by plaintiff, and as far as concerns the quality and condition of the lettuce reads as follows:

"Lettuce fresh, crisp and well trimmed. Wrapper leaves good green color. Stock free from defects, consists of about 60% firm and 25% fairly firm; 15 to 20 per cent soft or tip burn."

It is explained by witnesses for plaintiff who are experienced in the handling of vegetables and fruits that 60 per cent firm means that the lettuce is of such solidity that it is desirable; 25 per cent fairly firm means it is not quite as good as firm but still comes within the grade considered as desirable lettuce; and 15 to 20 per cent tip burns means that the lettuce shows a slight burn or brownish burn on the outer tips or edges of the outer leaves which can be caused by several elements or growing conditions, but does not affect the soundness of the lettuce. In short, the testimony of the plaintiff established unquestionably that the lettuce was in good and sound condition at the time that it was loaded into the car, and if placed in a refrigerator car properly equip-

ped and iced should have been in good and sound condition upon its arrival in New Orleans. The shipment left Colma, Cal., about 7 p. m. on July 27th, and arrived in New Orleans on Friday, August 5th, about 6. a. m.—nine days later.

The plaintiff admits notice of the arrival on August 5th. Mr. Bonura testifies that he inspected the goods on the same day it arrived and found the lettuce in bad condition, generally affected with a slimy decay or rot. That he declined to accept the shipment and immediately took the matter up with the shipper's broker in New Orleans as to the responsibility for the damaged goods. After communicating with the shipper concerning the condition of the lettuce, the shipper insisted that the lettuce had been inspected at point of origin and was in good and sound condition as appears from the government certificate of inspection, hence he was not responsible for any loss, and that plaintiff must look to the defendant carrier.

Plaintiff then accepted the goods from the defendant on August 9, 1927. On the day of acceptance plaintiff requested a federal inspector to inspect and report as to the condition of the lettuce. The report is as follows:

"In outer row of crates next side walls of car, decay ranges from 4 to 50%, average for these crates approximately 20%. In 3 center rows of load in most crates from 4 to 25%, few none, average for the three center rows of crates approximately 10%. Decay is Slimy Soft Rot affecting generally from 3 to 5 leaves."

Plaintiff then caused it to be sold at public auction by the Fruit & Produce Exchange, Inc., whose business it is in this market to sell such products. It appears that the Exchange sells only on Monday, Wednesday and Friday. Due to the negotiations with the shipper concern-ing responsibility for the damages to the lettuce, the car was accepted on August 9th, and offered for sale on Wednesday, August 10th. All of the lettuce was not sold on the 10th, and the balance was sold on the 12th.

The goods were sold for $889.25. The market price of the lettuce at the time and place of delivery would have been $1,296 had the lettuce arrived in good condition. Plaintiff therefore claims the difference between the market price of good lettuce at the time of delivery and the amount realized from the sale of the damaged lettuce as the loss which it sustained, or $406.75.

The defendant's evidence shows that the refrigerator car in which the lettuce was shipped was properly equipped and cleaned and the vents closed and plugs in; that the car was properly inspected and ice and salt added to the bunkers at ten stations en route, not including the initial station. The car was inspected by defendant three times in New Orleans and ice and salt added to the bunkers once before plaintiff accepted the shipment. Most of the evidence of the defendant is taken by deposition, the witnesses testifying that they were referring to the company's records, although the original records were only produced in two instances. In short, the evidence offered by defendant, if accepted as true, would show that the refrigerator car in which the lettuce was shipped was in good condition and properly equipped and cleaned; that it was thoroughly iced to its capacity at the point of origin and at ten intervening stations en route was re-iced and salt added in accordance with the instructions of the shipper; that the car arrived in New Orleans with the seals intact within nine days or under schedule time for such shipment; and that upon arrival of the car in New

Orleans the bunkers were re-iced to their capacity and salt added and that proper refrigeration was maintained from the time the car left Colma, Cal., until it was accepted by plaintiff in New Orleans.

We therefore have a situation before us where the plaintiff's evidence, if accepted as true, proves a case of liability against the defendant carrier. On the other hand, if the evidence of the defendant is accepted as true, it has proved itself to be free from fault and negligence but has failed to prove the reason why the lettuce deteriorated or decayed.

We are of the opinion that the certificate of inspection of the representative of the United States Department of Agriculture and the other evidence offered by plaintiff in support thereof proves that the lettuce was "fresh, crisp and well trimmed" when loaded in the car on July 27, 1927. The federal inspector's report of August 9, 1927, offered in evidence by the plaintiff and supported by the plaintiff's other proof, establishes the fact that when the car was opened on that date the lettuce was generally in a state of decay or slimy soft rot affecting three to five outer leaves. It is established that the market was up at the time the merchandise arrived on August 5, 1927, and that the plaintiff could readily have disposed of the lettuce at a substantial profit. Therefore, there can be no good reason why plaintiff would refuse to accept the shipment when delivered, unless the merchandise was in the state of deterioration or decay which Mr. Bonura says the lettuce was, the day he inspected it on its arrival. If the market were down at the time, there would be a reason for saying that the plaintiff misrepresented the condition of the merchandise when it was delivered. However, such is not the case here.

We are also satisfied that the acceptance of the car on August 9th, and the sale of the merchandise on the 10th and 12th, respectively, was effected as promptly as possible under the circumstances and the loss minimized as much as possible.

The witnesses for the defendant, who iced the car en route, admitted that if the merchandise were in sound condition at the time it was placed in the car, and if the car was properly equipped and iced, the lettuce would have been in good merchantable condition upon its arrival in New Orleans, and that perishable merchandise or vegetables were regularly shipped from California to New Orleans in refrigerator cars without affecting their merchantability. It is impossible to reconcile these statements with the other statements of the witnesses that their records show that the car was properly cleaned, equipped, and iced at the initial point and proper refrigeration maintained in transit and in New Orleans up until the time of acceptance by the plaintiff. The defendant non-resident witnesses' testimony taken by deposition shows the number of pounds of ice remaining in the bunkers upon the arrival at the respective ten stations where the car was re-iced and salt added. The testimony of the witnesses at New Orleans as to the icing of the car shows merely an approximation of the quantity of the ice in the bunkers, i. e., seven-eighths, thirteen-sixteenths, eleven-sixteenths full, and the number of pounds of ice and salt added; but these witnesses admitted that it is impossible to tell how many pounds of ice remain in the bunkers without actually taking the ice out and weighing it. This testimony, therefore, is inconsistent with the testimony given by the non-resident witnesses. It is to be noted that the capacity of bunkers of the car was 10,600 pounds of chunk ice. Ap-

parently the reports used by the non-resident witnesses in giving their testimony as to the re-icing at the respective stations, the number of pounds of ice remaining in the bunkers was approximated by deducting the number of pounds of ice added from the total capacity of the car. Nevertheless, a tabulation of the icing records as testified to by the non-resident witnesses gives the number of pounds of ice remaining in the bunkers as a mathematical certainty and not as approximations. All these reports are alike in this respect; add the number of pounds of ice remaining in the bunkers to the number of pounds of ice that was placed in the bunkers makes the total number of pounds of ice in the bunkers exactly equal to their total capacity of 10,600 pounds.

We are impressed with the fact that the decay was general throughout the car and only the outer leaves of the lettuce were affected. This would indicate there was no inherent vice in the lettuce that caused it to deteriorate but improper refrigeration. The inspector's report shows greater percentage of decay in crates next to the walls of the car than other parts of the car.

Realizing that great weight must be given to the certificates of the federal inspectors at the point of origin and destination concerning the condition of the lettuce, counsel for defendant argues that we only have Bonura's statement that the merchandise was in a decayed state when it arrived on August 5, 1927; and that in going in and out of the car warm air may have gotten into the car and caused the slimy rot reported by the inspector on August 9, 1927. This argument is not tenable for the reason that defendant's evidence shows that the car was inspected three times after its arrival in New Orleans and that it was necessary only once to add 3,000 pounds of ice and 60 pounds of salt from period of August 5 to August 9, 1927. Further, plaintiff's evidence shows it is customary for merchants to open the cars and inspect them upon their arrival, and that going in and out of the car will not affect the perishable goods if the door is not left open. Finally there could be no motive for the plaintiff to say the merchandise was damaged, as the market was up and plaintiff could have sold the lettuce at a profit.

The judge a quo found that the merchandise was in good condition when shipped and in a decayed condition when received, and that the perfect icing record by the railway company cannot be reconciled with the rotten and decayed condition of the lettuce upon its arrival in New Orleans, and that the railway company had failed to exculpate itself from liability. In short, as we view the reasons for judgment as given by the trial judge, he believed the evidence and testimony of the plaintiff and did not believe the evidence and testimony of the defendant.

The burden of proof is unquestionably upon the carrier to prove itself free from negligence. Guidry v. Texas & Pacific Railway Co., 6 La. App. 169; Bonura v. Payne, 7 La. App. 754; and Chalona v. American R. R. & Express Co., 11 La. App. 18, 123 So. 147.

In the case of Guidry v. Texas & Pacific Railway Co., supra, a similar case was presented involving a shipment of vegetables from Hahnville to Chicago and delivered in bad condition. In reviewing the testimony of the defendant's witnesses in that case, this court said:

"But the testimony of these witnesses must be taken with all the influences of interest and uncertainties of times and conditions. They handle thousands of cars and speak of occurrences years behind

and mostly from records. There is every occasion for error and confusion."

In the case of Chalona v. American R. R. & Express Co., supra, this court in speaking of the limitation of liability for loss resulting from defects or inherent vices contained in the bill of lading, said:

"This limitation, however, does not relieve the defendant of the obligation of proving that the cause of the loss was one of the things within the limitation."

The evidence in this case does not, in our opinion, bring defendant's case within any of the limitations of liability provided in the bill of lading.

As we view the case an issue of fact is primarily involved, and a careful reading of the record does not convince us that the judge a quo was manifestly in error.

Judgment affirmed.

JANVIER, J. (dissenting). I am forced to disagree with my associates in their opinion that defendant should be held liable here. The amount involved is small, and therefore the payment of the judgment, I am sure, will give the carrier no great concern. But I fear that the principle involved will, if followed in the future, establish a doctrine that a carrier of perishable vegetables is an insurer thereof and that liability for loss resulting from decay during transit cannot be avoided no matter how perfect the proof of the carrier's freedom from negligence. It is important to note, at the outset that the district judge has plainly fallen into error in stating in his written reasons for judgment that the bill of lading acknowledges receipt of the lettuce in good condition, because, as is evidenced by the record, the shipment moved under what is known as a "shipper's load and count" bill of lading, which, as I understand it, means that

the shipment was loaded and counted entirely by the shipper; that it was not inspected by the carrier; and that the carrier, at point of origin, knew nothing whatever of the quantity, quality, or condition of the contents of the car.

The bill of lading contained the following stipulation:

"No carrier or party in possession of all or any of the property herein described, shall be liable for any loss thereof or damage thereto, or delay caused by the act of God, the public enemy, the authority of law, or the act of default of the shipper or owner, or for natural shrinkage * * * except in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage or delay occurring while the property is stopped and held in transit under the request of the shipper, owner, or party entitled to make such request, or resulting from a defect or vice in the property, or for country damage to cotton or from riots or strikes."

The law relative to the liability of the carrier for losses due to decay in shipments of perishable fruit and vegetables is very plain, and we find it well stated in McNeil & Scott Co. v. Great Northern R. Co., 156 Minn. 120, 194 N. W. 614, 616. With reference to the carrier, the court said:

"He is not an insurer that perishable freight, which term includes such commodities as fruits and vegetables, will be delivered at destination undamaged. His undertaking in transporting such commodities is to exercise reasonable and ordinary care to preserve and deliver them in a sound condition. If they arrive in an unsound condition, he is not liable in the absence of evidence that negligence on his part caused, or aided in causing, the damage. Evidence that the shipment was in sound condition when received by him and in an unsound condition when delivered

at destination is prima facie proof that the damage was caused by his negligence; but he may rebut this presumption by showing, in any way that he can, that he was not at fault. George B. Higgins & Co. v. C. B. & Q. Ry. Co., 135 Minn. 402, 161 N. W. 145, L. R. A. 1917C, 507."

This court followed this rule in Joseph Chalona Co. v. American Ry. Express Co., 11 La. App. 18, 123 So. 147, which is a case so absolutely identical with that now before us that, in my judgment, it cannot be distinguished, and in which case this court said:

"It will be seen, then, that the carrier is called on to furnish affirmative proof showing all essential matters with reference to the handling of the car."

Here the proof is overwhelming that the car which contained the shipment was in good condition; that the time consumed in making the trip was remarkably short; that the car was not opened or tampered with en route.

I say here, as we said in the Chalona case:

"The sole remaining question, and the most important one, is whether or not the car was kept properly iced throughout the journey. Defendant offers a mass of evidence from every point, between the two termini, at which the car was stopped for icing to show that the ice bunkers were replenished ten times en route after the initial icing and twice more after arrival in New Orleans and before consignee accepted delivery."

Here the icing and salting records are absolutely perfect and they show that, at every point at which the car stopped for ice en route, its bunkers were filled to capacity and that at none of these points had the ice in the bunkers been reduced to less than seven-eighths of the entire capacity of the bunkers, and they also show that the bunkers were kept full of ice during the five days the car remained in New Orleans after its arrival.

It would serve no good purpose to detail the evidence as to the handling of the car and as to the icing thereof. Suffice it to say that the record is perfect and shows not one minor detail in which the carrier was at fault.

But, say my associates and the district judge, the lettuce was in good condition when shipped and in bad condition when inspected here five days after arrival. In other words, no matter what the care of the carrier, it is liable if a perishable shipment, when inspected after arrival, is found to be in poor condition. I do not understand that to be the law of this or of any other state in the Union.

The carrier has completely sustained the burden of showing its own freedom from negligence. This is all that, in my judgment, it is required to do.

On the other hand, there is in the record evidence as to certain things at both ends of the line, which evidence renders it very doubtful if the lettuce was in good condition when shipped, and also throws grave doubt on the question of whether it was in bad condition when it arrived in New Orleans.

The inspector's certificate at point of shipment shows, among other things, "15 or 20% soft or tip burn."

It is true that a diligent effort is made to prove that "tip burn" is of no impor-

tance and that softness in no way affects the quality of lettuce or its ability to withstand shipment. However, one of the witnesses for plaintiff admitted that "it does not affect the soundness of the head of lettuce unless it becomes very prominent and to the extent where it develops into slime." This statement I consider quite significant in view of the fact that the slimy condition, when, five days after arrival, it was finally inspected at destination, is what is complained of.

But the most suspicious circumstance is the conduct of plaintiff here. When the car arrived, plaintiff examined the contents and, in spite of the claim now made that they were rotted and slimy, plaintiff did not, at that time, complain to the carrier, nor did it obtain an official inspection, but, instead, allowed the contents to remain in the car more than four days, entering the car several times during that period, and did not obtain an official inspection until the fifth day.

In view of these facts, I feel that the real cause of the condition of the lettuce was its inability to withstand shipment, and that the carrier has established, beyond the fondest expectations of the most optimistic defense attorney, absolute freedom from negligence.

In the short span of life of every vegetable there comes a time at which its precarious existence approaches what in humans is described as "three score years and ten," and when, though apparently in perfect health and vigor, it is, nevertheless, on the verge of decay and collapse. An inspection today may give the impression of soundness; tomorrow, or on the next day, a mere layman can tell that it is on the brink of the grave. It is like the biblical "grass of the field which today is and tomorrow is cast into the oven."

If this were not so, why would such vegetables be called "perishables"?

At the time of shipment the lettuce had reached a period in its brief existence at which it was about to spoil, but at which, so far as an inspection could show, it was in good condition.

I find that at point of destination the actions of plaintiff were most suspicious. On the arrival of the car it was opened by plaintiff's representative, and, it is now contended, was found to be largely spoiled. What did plaintiff do? Did it cause an official inspection to be made? No. Did it complain to the carrier? No. For five days it did neither of these normal, customary things. I cannot believe that this plaintiff, who, according to the records of this and other courts, is thoroughly familiar with the methods of procedure in filing claims and instigating suits thereon, would have allowed five days to elapse before calling attention to the deterioration, if in fact it existed when the shipment arrived.

During the five days in question the car was opened many times by representatives of plaintiff, and it may well be that the consequent admission of warm air was responsible for the decayed condition of the lettuce when the official inspection was finally made.

At any rate, as between the positive, affirmative, flawless proof of the carrier, and the evidence offered by plaintiff, I believe that that of the carrier substantially preponderates.

I am unable to understand the statement contained in the opinion of the trial judge to the effect that "the case appears to be a test case." I see nothing in the case which would indicate the necessity for a test, unless it be on the question, as the trial judge states, of whether or not, where the carrier shows a perfect record of handling, it is nevertheless liable solely by reason of the fact that a loss has occurred. If this is the legal question that is being tested, I am thoroughly convinced that the answer is that, where the carrier of perishables shows, as it has shown here, that the container was in perfect condition, that usual customary schedules were maintained, and that the car was properly iced at all times, there is no liability in the carrier.

I therefore respectfully dissent.

## ON APPLICATION FOR REHEARING

......................, J. Since the opinion in this case was handed down, we have been favored with a number of briefs prepared by prominent members of the bar, representing public carriers, and filed with us as amici curiae, in support of appellant's application for a rehearing. The apparent interest in the litigation, the eminence of counsel and their standing at the bar, impels us to depart from our usual custom of acting upon applications for rehearing without comment.

We have carefully reconsidered the case and have come to the conclusion that our former decree was correct. The case is one which we find difficult to realize as of the transcendent importance imputed to it by counsel, since it involves a simple question of fact. A shipper of lettuce sues to recover for damage to the ship-

ment sustained in transit. The carrier defends on the ground that the damage was due to an inherent vice or defect in the lettuce. The trial court held, under unquestionable and unquestioned authority that the burden of proof was upon the carrier and that it had failed to sustain this burden; and this court, under the authority of hundreds of cases of our Supreme Court and of this court, to the effect that a trial court's finding of fact will not be disturbed unless manifestly erroneous, held that there was not sufficient evidence in the record to justify a finding that there had been manifest error in the judgment complained of.

The rehearing applied for is refused.

JANVIER, J., dissents for written reasons on file.

JANVIER, J. (dissenting): I cannot agree that this case really presents a question of fact.

The trial judge in his statement suggested that this is a test case. I assume that his statement means: "Is a carrier liable for deterioration in perishable shipments, where the uncontroverted evidence shows that the shipment was transported promptly, the car used was in perfect condition and all icing and other instructions given the carrier were carried out to the letter?"

In my opinion the question should be answered in the negative and I believe that the opinion rendered by the majority of the court, in effect, answers it in the affirmative. I consider the legal question so important that I have decided to depart from my usual custom, and to dissent from a refusal to grant the rehearing.