The Taormina Corporation of the State of Delaware, doing business in the City of New Orleans, purchased from Anaheim Canning Company of Los Angeles, California, one thousand five gallon cans of tomato pulp, which were delivered to the *Page 236 
S.S. Edgar F. Luckenbach in the harbor of Los Angeles, on or about September 19, 1938, for shipment to the City of New Orleans. After the arrival of the tomato pulp in New Orleans on October 7, 1938, the contents of two hundred and three cans were found to be worthless, whereupon after ineffectual effort to obtain a settlement, this suit was brought against the owners of the vessel, the Luckenbach Gulf Steamship Company, Inc., wherein the Taormina Corporation claimed $609 as the value of the tomato pulp at $3 per can, which included $.25 per can freight charges.
The defendant answered admitting that it had received the shipment in California and that upon its arrival in New Orleans a number of the cans were in bad condition, but deny liability because the damage to the shipment is alleged to have been caused by fermentation, decay, putrefaction, etc., for the effects of which it is not liable under the following provisions of its bill of lading:
"Received in apparent good condition by Luckenbach Gulf Steamship Company, Inc., hereinafter called the shipowner, various packages said to contain merchandise; contents, value, weight, quality, condition of contents. * * * unknown to the shipowner * * *."
Art. XVII. "Neither the carrier nor the vessel shall be liable for loss, damage, or delay whether occurring before, during, or after loading transit * * * discharge * * * delivery or other disposition of the goods arising from any of the following causes: Causes beyond carrier's control or any effects of climate, weather * * * mold, fermentation * * * decay, putrefaction, decomposition * * * swelling * * insufficiency of package in strength or otherwise, rust, stain, breakage, bending, buckling * * * blowing, bursting of casks or packages from weakness or natural causes * * * leakage, deterioration, decay."
Defendant also avers that no proper notice of damage to the shipment of tomato pulp was given as required by Article 23 of the bill of lading.
There was judgment below in favor of the plaintiff as prayed for and defendant has appealed.
The universal rule is that a carrier is obliged to deliver merchandise entrusted to it for carriage in the condition in which it was received. This rule is subject to certain exceptions, for instance, where perishable goods are shipped, such as corn or fruit which are subject to deterioration and decay regardless of the care bestowed upon them by the carrier. John Bonura Co., Inc., v. Texas N.O.R.R. Co., 14 La.App. 351, 126 So. 593; rehearing denied, 14 La.App. 351, 128 So. 68, certiorari denied 282 U.S. 875, 51 S.Ct. 80, 75 L.Ed. 773; Close v. Missouri Pacific R.R. Co., La.App., 191 So. 596; 13 Corpus Juris Secundum Carriers, §§ 71 and 254; and 9 American Jurisprudence, Secs. 692, 693 and 844, "Carriers".
The recital in a bill of lading to the effect that the shipment is "in apparent good order and condition" means only what it says and is an acknowledgment on the part of the carrier that from external appearance the shipment is in good order. The fact that the bill of lading exempts the carrier from the effects of "fermentation, decay, putrefaction, decomposition," etc., can not affect its responsibility for cargo which, as a matter of fact, has been delivered to it in internal and external good order except, of course, perishable goods so that the question here, the only question it seems to us, is whether the tomato pulp, when delivered to the S.S. Edgar F. Luckenbach in the harbor of Los Angeles, was in such condition.
In the opinion in The Columbo C.C., 1856, Fed.Cas. No. 3,040, a case cited by the defendant, we read: "It seems to me, therefore, that the case is one in which effect should be given to the clause in question, and in which the burden lay upon the libellants to prove the condition of the contents at the time the goods were delivered on board of the ship; and that, in the absence of such proof, the carrier is not properly chargeable for the condition of the contents. It would be very unjust to charge him, if they were delivered to the consignee in the condition in which they were received on the ship; and, for aught that is stipulated in the bill of lading, I think they were."
In the Niel Maersk, 2 Cir., 91 F.2d 932, 934, 1937 A.M.C. 975, certiorari denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, decided by the Second Circuit Court of Appeals, also cited by defendant, the court considered a claim for damage to a shipment of fish meal in bags in connection with the provisions of the bill of lading *Page 237 
with respect to apparent good order as well as that with reference to inherent vices and stated that "the shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment" and referring to the exception in the bill of lading, the court said: "In the present case, unlike Schnell v. The Vallescura [293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373], we are not concerned with the applicability of the bill of lading exception relieving the carrier, for there is no proof of the condition of the fish meal when loaded."
In the Chester Valley, 110 F.2d 592, 594, a recent case decided by the Fifth Circuit Court of Appeals and also cited by counsel for defendant, it was held that notwithstanding the fact that the record showed that a shipment of flour had been negligently stowed too near to a shipment of beef casings which, it was claimed, might communicate a malodorous taint to the flour, nevertheless, the absence of proof to that effect prevented recovery. The court said: "We agree with respondents on both points. It stands not only found, but conclusively established on the record, that the damage to the flour was the result of an excess of bacterial activity in it, and not the result of taint or odors communicated to it from the beef casings. It stands established and found too, that there was no proof of either the bacterial content of the floor or its activity when the cargo was delivered to the carrier. Upon such a record and findings, appellant may take no comfort from the finding of the District Judge that stowing the flour in the hold with the beef casings was negligent stowage. For, proof of negligence alone does not establish liability; it must also appear that the negligence caused or contributed to the damage claimed. Especially where as here, it was found upon ample proof, that such negligence was not the cause of the damage".
There is no contention here that the carrier was guilty of any specific act of negligence. The assertion is made that the cans were shipped in good order internally and externally, and that, therefore, the fact that they were delivered in bad condition creates a presumption of negligence which the carrier must overcome.
As we have said, the shipment consisted of one thousand cans of tomato pulp, which were processed and packed in California. There is evidence in the record procured by commission as well as given viva voce on trial of the case, to the effect that one thousand five gallon cans represent one day's run by the Anaheim Canning Company and that all of the tomatoes in these one thousand cans were a part of one homogeneous mass processed at the same time; that the tomato pulp was placed in one thousand new cans purchased from the Continental Can Company of Los Angeles which were, according to plaintiff, "scientifically sterile and hermetically sealed so that infection or bacteriological contamination was impossible". This latter statement is challenged by opposing counsel, who contends that there is no proof to that effect. The cans were then stacked in rows three high and allowed to remain at the Canning Company's place of business for three days. The explanation of the three day delay is that it is necessary in order to detect any imperfections in the sealing of the cans, because, within that period of time, fermentation would be expected to progress to such an extent as to be noticeable. The cans were placed in fiber cartons and delivered to the carrier. When the cans arrived in New Orleans the defendant notified Taormina Company that part of the shipment was in a damaged condition. A representative of Taormina went to the docks, to which the shipment had been removed, and, after, inspecting the shipment, rejected one hundred and forty-three cans at once, and caused the remaining eight hundred fifty-seven cans to be removed to its storehouse. Some days later sixty additional cans were found to be bad and the Steamship Company was notified by telephone and letter to that effect according to Anthony Taormina, Secretary-Treasurer of the plaintiff corporation. It is conceded that the fiber cartons, in which the cans were shipped, showed evidence of physical abuse as well as the cans, though there is some dispute as to the number of cans and the extent of the abuse. Many of the cans were puffed or swollen, but the contents of most of the cans, some of which also showed evidence of abuse, were in good condition.
Two experts testified — Dr. Harold Levey, a chemical engineer, for plaintiff and Mr. John M. Danneker, a chemist, for defendant. They differed in their opinion as to *Page 238 
the cause of the fermentation of the tomato pulp.
Dr. Levey seems to have attained no little recognition in his profession, for he testified that he was a Senior Fellow of the American Institute of Chemical Engineers, past Vice-President of the American Chemical Society; counsel for the State of Louisiana for the American Chemical Society, Senior Fellow for the American Institute of Chemists and an Officer of the Louisiana Engineering Society. He has a degree from Tulane University and the University of Illinois and has been practicing continuously since 1916 in New Orleans, Chicago, Milwaukee and Sioux City. Dr. Levey was asked whether it would be possible for a few cans out of a number of cans of tomato pulp mixed in one batch in one day's operation to show deterioration due to bacteriological causes and the remainder of the cans to be free from such contamination. He replied in the negative, saying: "When a batch of tomato pulp or similar food products are in a vessel, particular products of the tomato pulp type, it is necessary to keep the mass agitated in view of the fact every can must contain the same amount of suspended matter as another can. In other words, they dare not leave the mass stagnant, they must keep it homogeneous. So, if a small portion becomes inoculated with some agency promoting fermentation, it is a matter of seconds before the entire mass through this method of manipulation, becomes equally infected with the same organisms so that the entire mass becomes contaminated".
Dr. Levey also testified that in a semi-tropical climate, such as Southern California, bacterial culture should cause fermentation to progress to a high degree in three or four days. It is fermentation, he says, which causes the swelling and puffing of the cans and finally, he gives his very definite opinion that the damage to the tomato pulp was not due to any imperfection in the sealing of the cans and explains at length his reasons for so believing.
On the other hand, Mr. Danneker, who is also quite prominent in his profession, holding a degree from Tulane University as a Pharmacist and another as a Graduate Chemist, and is also City Chemist for the City of New Orleans, believes that "the damage to this cargo was caused by puffing and splitting of the cans due to incomplete sterilization of the product at the time of canning". However, he does not challenge the statement of Dr. Levey concerning the three days in which fermentation sets in.
In the confused state in which a consideration of the conflicting testimony of the experts finds us and as we grope about for light and leading, we observe that a great number of the one thousand cans had been subject to abuse during the voyage or, at least, after they were delivered to the carrier, there being no pretension that the cans were mistreated before delivery. On the contrary, the bill of lading acknowledges that they were in good external condition.
The cause of the decay and fermentation, it is agreed by everyone concerned, was due to the infection of bacteria caused by a leakage of air into the vacuum created or which should have been created when the cans were sealed. It seems to us more reasonable to conclude that this infection occurred during the voyage.
Counsel for defendant states that there is nothing in the record to indicate that the tomato pulp was all a part of the same batch of tomatoes as we have declared it to be, but we believe he is mistaken in this respect, for we find that Mr. Glorioso, Treasurer of the Anaheim Canning Company, testified that: "Well you see they were all made from one batch, processed under one process, and therefore they all must be bad or good".
Counsel further makes the point that even if the entire shipment had been taken from the same mass of tomatoes all the cans may not have been properly sealed, causing some to deteriorate and others to preserve their contents. This is quite true, but the evidence convinces us that the cans were all properly sealed and the contamination of the contents of those that were damaged was due to physical abuse on the voyage.
We, therefore, conclude, as did the trial judge, that plaintiff should recover, but defendant's counsel says that recovery should be limited to one hundred and forty-three cans at $2.75 per can and not $3, because no freight charges can be recovered, and, as to the other sixty cans no notice of damage was given. The following provisions of the bill of lading are relied upon:
"Full freight to destination whether intended to be prepaid, or collected at destination, and all advance charges are due and payable to the carrier upon receipt of the goods by the latter, and shall be deemed irrevocably earned, vessel or goods lost or not lost, at any stage of the entire transit, or at *Page 239 
destination, freight and charges shall be paid in full on delivery, and to secure full payment thereof, said goods are hereby pledged to the carrier. Full freight and charges shall be due to the carrier on containers, though part full or empty, and on damaged or unsound cargo * * *.
"All claims for damage to cargo * * * must be presented in writing disclosing fully the nature and extent thereof to the ship-owner or to the vessel's agent at the port of discharge before the cargo is removed from the carrier's custody or final receipts signed. Unless presented as above provided all claims of whatsoever nature and extent shall be waived and no suit shall be maintained to recover same * * *".
As previously pointed out, when the thousand can shipment arrived at New Orleans, the defendant notified plaintiff that part of the shipment was in a damaged condition, and plaintiff sent its representative to the docks to which the shipment had been removed. Plaintiff's representative rejected one hundred and forty-three cans at once and removed the remaining eight hundred and fifty-seven cans to its storehouse. Some days later sixty additional cans were found to be bad and defendant, according to the testimony of Anthony Taormina, Secretary-Treasurer of plaintiff company, was notified by telephone and letter of the condition of these sixty cans. It is for these latter cans that defendant contends no recovery can be had.
In Vol. 58, Corpus Juris, "Shipping", section 709, is found the following: "Noncompliance with stipulations requiring notice of loss or claim may be excused and recovery of damages permitted where the carrier already knew of the loss or claim * * *".
Undoubtedly, the steamship company had actual knowledge that the sixty additional cans were damaged, therefore, it was unnecessary to give notice. However, as we have said, according to Anthony Taormina, the steamship company received ample notice of loss of the sixty cans. Accordingly, we believe that plaintiff is entitled to recover the value not only of the one hundred and forty-three cans rejected at the dock, but also the value of the sixty cans subsequently found to be damaged.
It is said that the freight paid on the lost cans can not be recovered. This point was raised for the first time in this Court. It is well settled that questions not raised in the lower court cannot be considered on appeal. See Succession of Quinn,183 La. 727, 164 So. 781; Gaines v. Crichton, 187 La. 345,174 So. 666; Althans v. Toye Bros. Yellow Cab Co., La.App., 191 So. 717.
For the reasons herein assigned the judgment appealed from is affirmed.
Judgment affirmed.